We will hear argument next in case number 232323, Swarm Technologies against Amazon. Good morning, your honors. May it please the court, I would like to start with the 101 issue here. The board's decision must be reversed because it is contrary to Alice and Enfish. These are hardware claims and they are configured architecture that improves the operation of the computer itself, not just a known process that's run on a general purpose computer. And because of that, these claims fit squarely within the Enfish safe harbor. Just are we talking about the substitute claims 13 and 14? Yes, your honor. And do I remember right, the board said it was going to reject those on two independent grounds. One is 101 and the other is written description support. That's correct, your honor. And I would like to address 112 after 101 if that is okay with the court. So your honors, these claims fit right into the Enfish safe harbor because they are improvements to computer architecture and configuration to computer itself. Let's look at what the claims are directed to. Claim 13 is directed to component architecture, where the controller populates the task pool and the coprocessors go to the task pool autonomously and proactively and search for tasks to perform. This is different from conventional systems, which were known as controller responder systems. Do I understand correctly that what the board was saying is that you've got these, what's it called, scrum board, right? And they're saying there's been a long known conventional way of organizing human activity using these scrum boards. And so the abstract idea is organizing computer activity, I guess, using a well-known way of organizing human activity. That's the way I've been kind of thinking about what they were saying in terms of their analysis and saying that that's an abstract idea. Well, two points. I mean, do you just agree that that's what they said? Not exactly, your honor. Okay. I agree that they said that the extracted limitations of the claim to recite the concept of a scrum board. And then they said that that could be performed by humans. But when you look at the extracted limitations of the claims, that's not all of the claims. And you can see that on page 91 is where they say the extracted elements, 92. And if you go back to 91, you can see that they're only taking out the functional limitations in the claim and saying they recite the concept of a scrum board. And that's contrary to Alice's directive. I thought that what they were saying was that, you know, if you think of the controller, I suppose, as a manager, and you think of the co-processors as workers, that it's analogous to the idea of having humans having a scrum board where the worker walks up and grabs a task and then performs it and then puts it back. And the managers, they're seeing that the tasks are being done and adding tasks to the scrum board. I'm not saying that that's ineligible. I'm just asking if you agree that that's the analogy that the board was looking at. And then the question becomes whether, sorry, go ahead, answer that question. I'm sorry, Your Honor. That is the second problem with the board's Directive 2 analysis. After extracting certain limitations, then it changed other limitations. It changed the structural limitations of a controller, a co-processor, and a task pool to a worker and a manager and a scrum board. But the claims have nothing to do with that. And, Your Honor, you mentioned an analogy. But it's not enough to simply identify some real-world analogy. ALICE requires much more rigor that you look at what the claims are directed to, not what they're analogous to or, as the board said, what they're configured to. In fact, this Court has addressed that analogous to issue, because it's come up before, in Data Engine. And in Data Engine, this Court said it's not enough to merely identify a patent-eligible concept in the claims. You have to be rigorous and look at the claim language itself, both individually and as a whole. And that the board did not do here. Do you view the board as having rejected, as a factual matter, that your claims are directed to improving computer functionality? Or do you view them as saying, OK, we'll accept that they improve computer functionality, but because the same idea, maybe abstractly, would help in other situations, it doesn't count? Your Honor, I don't believe it was a factual rejection. But I believe that because the board extracted some elements and changed other elements, that it failed to look at the claim language as a whole and the spec, which requires the elements to be configured specifically. I'm sorry, did I answer your question?  I want to make sure I covered it. So, Your Honors, Data Engine has already dealt with this analogy theory, and Data Engine has dealt with the configure-to theory. And the board simply did not provide a directed-to analysis under Step 1 that looks at the claims, both individually and the language as a whole. Because if it did, it would have found that the claims are patent-eligible because they fit that in-fish-safe harbor of improving computer functionality. I want to address your question one more time. I think you, if my colleagues don't mind, I'm curious about a written description. As I understand it here, it's without any communication limitation. And here the issue is whether that's broad enough to include within the language both indirect and direct communication. So, therefore, because it's a negative limitation, you need written description support for having no direct and no indirect communication. Did I say that right? That's the way the board looked at it. But, Your Honor, the board, on its 112 analysis, construed without any communication with the controller to be contrary to the plain claim language and to be contrary to the construction of that same limitation that it used in applying its 103 analysis. Your Honors, in the 103 analysis, the 103 construction is correct. Amazon proposed that construction. We did not dispute it. And the board adopted it. And that construction is- Show me where that is, yes. Yes, Amazon proposed the construction- First, where in the board's opinion is the 103 construction? Yes, Your Honor. It's at... One moment, Your Honor. So, you're looking for the board's construction on obviousness. Right, the construction of any communication, how they understood the term. Can I walk you through how they got there? And then I can get to the... Because I don't think it's stated, this is the construction. But I think it's required. And that's because in the petition, Amazon said, without any communication with the controller, occurs because the co-processors only communicate with the intermediary. And then they said that because of that- And do you have an appendix page set for that? Yes, appendix page 383. And because of that, Your Honors, dynamic acceptance, according to Amazon, occurs without communicating with the TCC in LORRI, which it equivalences to the co-processor, to the controller, because the TCW contacts the intermediary. In LORRI, that's the ATD mechanism. So, let me say that again. Dynamic acceptance of a co-processor occurs without communicating with the TCC because the TCW contacts the intermediary, here, the ATD mechanism, instead. That's at 383. Sorry, so the petition was allowing for indirect communication to occur both in your claims, and therefore thought they could invalidate your claims by pointing to LORRI having indirect communication. Is that what you're saying? Yes. And I think indirect communication should also be understood to mean communication with the intermediary, because it's not communication with the controller. It's communication just with the intermediary. And the board called it indirect communication. Sometimes it comes up in the spec as that as well. Your Honors, I'm sorry I didn't have that cite for you earlier. The decision, the place where the board applied its obviousness decision is at appendix page 40. And the board said, citing LORRI at 1251, as such, the ATD mechanism provides a level of indirection between the TCC and the TCW. So the board applied the construction wherein that level of indirection, that communication with the intermediary, is not included in the language without any communication. But then when the board got to 112, it did the exact opposite. And because those two constructions cannot be reconciled, and if you look at the claim language, the claim language itself is replete with this indirect communication where the co-processors only communicate with the task pool, not with the controller. For example, we're looking here at 13G, but if you also look at 13C and 13D, they talk about the activities that the co-processors perform in searching for and receiving the tasks from the task pool. And they do all of that without, quote, all without any communication between the co-processor and the controller. So this indirect communication lives in harmony with the without any communication with the controller. If we were turning to the written description, where do you think your best support is for the without any communication limitation? So, Your Honor, the specification talks about it two ways. First, the specification is clear that the co-processors communicate with the task pool. And that's the point of this invention, because as we were discussing in the prior argument, relieves burden on the controller. You can see that at appendix 151, lines, column two, lines 14 and 19. Is that in connection with obtaining tasks and performing tasks, or is that in connection with the plug-and-play of the processor? It's both, Your Honor. Okay, so where does it talk about no communication with respect to the plug-and-play? Or just communication with the task pool with respect to the plug-and-play? Your Honor, I believe that that is at column eight to nine. Nope, that's not, wait. Okay, so I believe that's at column eight to nine. Here we go. I'm sorry, Your Honors. At column 10, line 29, but moving on through that paragraph to about line 32, it says, moreover, the task pool itself may exclude particular cells on the basis of low performance, undeniable, unreliable connection, or poor data throughput. How is that plug-and-play? I have one more. I'm sorry. Oh, I'm sorry. I just want to know how that is in your mind. How do I know that's plug-and-play? Well, it is plug-and-play because one of the advantages to the system is that the system can use the coprocessing capabilities of other coprocessors that aren't already connected to the system but are on the same network. And because of that advantage, that is how the plug-and-play works. And there's an example specifically in the patent about a smart light bulb where that smart light bulb is in the network but it's not currently connected to the system. And the smart light bulb, due to its programming and configuration, recognizes that the task pool is overloaded and that smart light bulb then joins the system to help process the tasks required by the task pool. Okay. I interrupted you. Did you want to give us that other site? I want to use the example of the smart light bulb and I'm looking for that site right now. Okay. A couple of sites. Let's see. First of all, at page 155, I think we just talked about this, column 10, lines 2 through 34, the task pool itself may exclude particular cells. And page 155, column 10, 45 to 47, the coprocessors may connect to the task pool such as being by wired configuration, which, I'm sorry, doesn't relate to the plug-and-play but certainly relates to no communication with the controller because they can't communicate with the controller if they're wired to the task pool. Let me quickly take you back to the construction. Did you originally have a claim, I think it was claim 20, that expressly called out without direct communications with the CPU? And if you did, doesn't that suggest the patentee had in mind a distinction between direct and indirect? And so when they said without any communication, they must have meant to exclude all types of communication? Your Honor, I believe it's claim 10. And claim 10 says that the process can be performed without any indirect communication with the controller. So claim 10 fits nicely within this paradigm we're discussing where this communication with the task pool, which they're calling indirect communication with the controller, doesn't satisfy communication with the controller. Your Honors, I see I'm into my rebuttal time. I would address 103, or I can, yes, Your Honors. Good morning, and may it please the Court. My name is Adam Greenfield on behalf of Amazon. To reset, there's two separate appeals here. The first regarding the 04 patent, the Board agreed with Amazon that all claims would have been obvious and that the proposed substitute claims are not patentable. The Court should affirm that decision. Separately, there's the 275 patent. And there, the Board upheld the claims based on one limitation, that is whether co-processors can proactively retrieve a task from the task pool. Amazon appeals that decision because it's based on an erroneously narrow construction that excludes express embodiments in the specification and violates the law of obviousness. Can you start by talking about 04, claim 13, and the written description point? Absolutely, Your Honor. The written description point, claim 13, the proposed substitute claim. Correct, Your Honor. All of the examples that Swarm has pointed to don't relate to dynamic acceptance of co-processors or plug-and-play. They relate to different aspects of the claim. And here, it's their burden to show that there is support, that there be an express disclosure in the 332 application, not the specification, the 332 application. And the Board agreed with us that they failed to do so. To, Your Honor, Judge Stark's point, you're right, in the original application, there is, I think it's claim 20 that talks about direct communication. That's a totally separate issue than the issue of claim 10 that I think Swarm was directing you to. And here, Swarm's position on the communication and how it's without any communication actually means with only indirect communication is really in tension with the argument that they're making in the Juniper Appeal, where they've said at their brief, in that case, at 31 to 32, that this same limitation, dynamic acceptance without any communication is plain. There's no definition in the specification. You don't have to look for extrinsic evidence. And all of that supports our argument in the Board's finding that there's no written description support. What about the argument that the Board's understanding, essentially, its construction was different in the 103 and the 112 context? That's not true, Your Honor. So first, this limitation in the 103 context wasn't disputed. And so the Board's analysis of that also comes up in the context of claim one, which Swarm hasn't appealed. So just to reset, so the Board found claim one, which includes this limitation, would have been obvious. And that this specific limitation wasn't disputed by Swarm. And Swarm hasn't appealed that. But the Board did go, I know it's not on appeal, but the Board did go on to find that Lurie, I think, if you help me if I'm wrong, disclosed without any communication, even though Lurie seems to have indirect communication. Not with respect to this limitation, the dynamic acceptance. All Lurie says is that, sort of at an abstract level, the ATE mechanism goes in between the TCC and the TCW, so it's an intermediary. But it doesn't say that for purposes of dynamic acceptance of TCWs, there is any indirect communication. We didn't argue that. In fact, we pointed to the activation daemon that the Board relied on. And that doesn't involve any communication back to the TCC. And I would just, to the extent that you look at our arguments in the petition that they're pointing to, look very carefully. None of the statements they're pointing to is Amazon arguing that Lurie TCWs indirectly communicate with the TCC when adding TCWs. That's not something we argued at all. It's sort of more general references to the ATD as an intermediary, generally, for certain things between the TCC and the TCW. What, responding to the point on the 04, Swarm pointed you to A40 of the Board's decision. Respect to that, I think if you take a closer look, it relates to a different element. It's not this dynamic acceptance element at all. And so we agree that with the Board here that everything they've pointed to for written description doesn't relate to this element. I'll move briefly to the 101 issue that they raised so that I have time on the 275 patent. We agree with Judge Stoll's framing of the Board's 101 decision and how it looked at the abstract idea of the Board in that sense agreed with Judge Humado in Arizona, Judge Donato in Northern District of California when this issue came up. I appreciate it's a different context. Isn't this different though? I mean, in that it's, you know, a lot of times when you say, oh, this is just organizing human activity on a computer, do it on a computer. They're talking about something like a business method, you know, or a dating app or bingo or something like that. Do it on a computer. Here, why isn't this borrowing an idea of how organizing human activity and saying, let's see if this will work on a computer system. Oh, it works. It actually makes the computer system work more efficiently. It's a, you know, providing, you know, what do they call that? You know, divided tasking or whatever by the computer, right? And so that it's the same as what's been done on a scrum board, the recognition that something like that might improve a computer network. Why isn't that a technological solution to a technological problem? Two things, your honor. The first is all of the, first of all, we'd say that the technical, the problem here is not unique to technology. This idea of speeding up and parallel processing, the same would be true for processing tasks in the real world in the scrum board example. And in this case, in this court's decisions in SCIMEO and PSG, they say the inventive concept can't be inherent in the abstract idea. And so everything that you referenced and that they're pointing to, that is the abstract idea of a scrum board, of returning tasks, completing tasks. Yeah, but that's a scrum board's for humans. And your view is that the idea of making a computer work better by using something that's made humans work better, you know, why is that not inventive? They would have to go the next step and have an actual technical solution. Here, the controller, the task pool, these are all described at a very high level in the specification. There's no suggestion in the patent that there's any technological changes. The only thing was the organization, the arrangement of conventional existing components in the manner of a scrum board. But what if the arrangement is a way that's never been done before, assuming that? Right, well, the 102, 103 answer is different. But here, if that arrangement just mimics the fundamental way of human organization, that's insufficient. Have we ever said that? Because I have the same question as Judge Stoll. I feel like we've said repeatedly, if it's an arguable innovation that improves the functioning of the computer as a computer, have we ever said, well, if you get there through an abstract idea or a non-technical idea or something that works for humans in other contexts, that's an exception to our point that if it improves the functioning of the computer, you're fine under Alice. Well, the court's holding aren't so narrow that as long as it improves technology or computer, that's sufficient to pass 101. That's definitely not the case. I tend to look at it as it just depends what, you know, perspective you're looking at. I feel like these 101 cases come before the court all the time in a parallel processing, distributing, distributed networking. And the patent owner argues, well, it's a technological improvement. And then, you know, the court has held some of these decisions. Well, no, if you just arrange it in a way that mimics the abstract idea, that's not sufficient. Like the EOLAS case versus Amazon, I think that's not precedential. But like that was an example of one of the distributed processing cases that comes to mind. Accenture, that had like a task engine, I think a task database, all sorts of similar computer models. These are cases where we have said, we grant that it improves the functioning of the computer, but because it does it based on an arguable abstract idea, not eligible. I don't know if the court came out and said, we grant that it improves the technology, but I don't think there's any dispute that there was sort of improvements in the processing. Like SAP is another example. And for me, it's just a matter of sort of what's the perspective that you look at it. Do you want to talk about your?  So turning to the 275 patent, here the claims require co-processors that proactively retrieve a task from the task pool. Amazon argued in its petition that it would be invalid under any reasonable construction, because we looked at the specific expressed examples in the patent specification. We figured the prior art does that, and so no construction is needed. The board adopted a construction that neither party proposed. Didn't it say proactive means not reactive? I mean expressly, that's what it said. Yeah, correct. The board's construction is initiating change rather than reacting to events, i.e. not being told to act or not react. What's wrong with just setting that as everything else that you're arguing aside? Do you agree that it's reasonable to say proactive means not reactive? I think that's reasonable in the abstract, but if it's then, whether it's further interpreted or applied to exclude the expressed examples in the specification, which we'd say are also proactive, are not reactionary, then it's insufficient. So it's, I think it's, those plain words though are okay. Okay, and when you say when it's applied, that's one concern I have is that I feel like your argument on claim construction squishes over into the fact inquiry. You know, first interpret the claims, then you're going to compare the claims as interpreted to the accused vice or the prior art, right? And so I feel like you've done that here and that when by saying first the court says or the board says proactive means not reactive and then it applies it, why is that not a question of fact? Because if the specification says proactive includes A, B, and C and the board adopts a construction that uses totally different words and says, oh, but that doesn't include example A, B, or C in the specification. We think that's an error of claim construction. We think whatever the construction is, any reasonable construction as we said in the petition, well, it has to at least include these examples. Otherwise, that's not a reasonable construction. And that didn't come to really light until you see how they then apply those words. So we think that's why it is a legal question. If the construction excludes the specification examples, that's an improper construction. Isn't it the application that excludes those examples? I don't think so. I mean, here it's, I guess, tricky because the board is construing and applying. There's no jury here. But if the board in adopting that construction has decided that that construction excludes these examples, I think whether that's an error of claim construction or lacks substantial evidence, I don't know if it... It's hard when the parties don't ask for construction, right? To know where construction begins and ends and what the party's positions are. We looked at the specification. We said, we do what's in the specification. Swarm didn't propose the construction adopted by the board. When you look at what they argued at the hearing at A9062, A9064, they say in each of those cases, it's sending an agent to retrieve a task based on its own internal determination. We said periodically that was an informal explanation of the term. Their construction at A6488 and their response refused one of those examples in the specification. I think all along, everyone was saying, well, if you look at the specific examples in the specification, that should be a no. That's all we're saying. And, but... Yeah, did you propose a form of words that made clear, as a construction, that made clear the inclusion of the examples? We didn't propose the specific words. What we said is under any reasonable construction, and we specifically referred to this periodic going back example. That's at A4303 through 06 of our petition. Our expert, I'll say it one more time, so A4303 through 06. That's where your proposed construction is. That's in our petition, and the Lowenthal Declaration at A5006 is one example where we argued that. But even if you move beyond the claim construction point to Judge Stahl, I'll just briefly say, we think if you look at, you know, there's many tasks that are retrieved. All that happens is at the initial when a TCW registers, there's a notification the tasks are available. Analogous to in the scrum board, you hire workers, and you say, here's the board that has the tasks. That's it. And then thereafter, whether it's the first task or task two through 100, there's no additional notification that happens, and that that should be sufficient because if the prior art validates it sometimes, or it would be obvious sometimes, then that would be sufficient. But what's unreasonable about the board's interpretation that because the whole thing only started with the kickoff, which with saying, in effect, here's the scrum board, I hire you, get started, that nothing that follows is proactive. It's all, at some level, a reaction to, hey, I've hired you, and here's the tasks, get to work. I think that that reading doesn't match the examples of proactive in the specification. That would start to bleed into an overlap with how the specification describes autonomous. Why would the examples of proactive in the specification, with the examples in the specification, why do they limit? Why should we read those into the claim? I'm not saying read them into the claim. What I'm saying is here, and take the scrum board example, you hire workers, and you say, here's the board that has all the tasks. And then thereafter, what I would say, proactive workers are ones that periodically, in the words of the specification, go up and take tasks. They don't need to be told each time, hey, there's tasks. Hey, there's a task. You're not taking up tasks. And so what we're saying is the construction excludes those specifications. Well, let's assume for a minute that we agree with the construction that proactive means not reactive. OK, so what do you do? It's kind of like a thought experiment, if you will. You've got a circumstance where there's a, someone tells you to do something, and then you do it, and you do it again and again. Are you being proactive? Are you responding to what you were told to do? Being the initial kickoff. Right, well, I would say that example is different than Laurie. Laurie isn't saying, and there's nothing in Laurie that says upon registration the ATD instructs the TCW to go retrieve a task. So the example of you're saying if it's telling you to do something and then you do it, is that sufficient? That's not really what Laurie is doing. Laurie is just saying a notification to all TCWs, tasks are available. And then the question is thereafter, does that preclude all proactivity? We'd say no, as long as it's doing what the specification says. Periodically, going to get a task. Or the other example that Swarm relied on, when the TCWs free up and have processing, that's when it goes to get a task, and it's not waiting to be instructed or notified again. We'd say that is sufficient to be proactive. And you would have to say, if I say under the construction, the construction of proactive is not reactive, period, you would say that having an initial kickoff, no reasonable fact finder could say that the initial kickoff, and then followed by the worker, sorry, doing the task over and over and over again, that no reasonable fact finder could say that that's being reactive. Well, correct under the substantial evidence. Yeah, we agree with that. We think that's the case for the first retrieval, because it's not really an instruction. But even setting that aside, retrievals two through 100, we don't think that notification precludes all proactively for all time. And I think when you read it like that, it starts to bleed in what they argued autonomous means, and what the specification says autonomous means. It kind of collapses those two terms. Okay. Thank you for your argument. Thank you, Your Honor. I want to address the 112 point first. And you're looking for support for the dynamic addition for the dynamic addition of the coprocessor. That is at appendix 155, column 10, at line 13 to 14, where it says, the wireless connection of cells into the system 10 facilitates dynamic addition and or removal of cells for the use of the system. And that also goes along with further language I previously quoted in column 10. That starts at 29 to 35. And then there's some more language about the wired configuration, which means that, actually, let's look also at column 12. And in column 12, line six, I believe it says, it talks about the laptop connecting to the task pool. And then further down at lines 14 through 21, it talks about a nearby unutilized device, such as a smartphone, connects to the task pool and sends its agents to fetch a masking task. Those are the dynamic support for the dynamic addition of additional coprocessors. Also, Your Honor, I'd like to point out that I think my co-counsel conceded the obviousness position because he said that what Rory does is it notifies, the ATD notifies the TCWs that tasks are available. Our obviousness position is that claims two through 12 require searching the task pool. They require the coprocessors to search the task pool. And here, Your Honors, nothing, nothing in Lory searches the ATD. The ATD, what it does, what it says it does, it's an automated task distribution system. Thank you, Your Honors. If you have no more questions. Could I ask you on the cross appeal, on the proactive, do you concede that the board's construction reads out of the scope of the claims, at least the embodiment of figure six? No, Your Honor, we don't concede that. And we rest on our briefs on that matter. Okay. Thank you, Your Honors. There was no real argument on the cross appeal.  Thank you. Case is submitted. Thanks to all counsel.